**Rufus HARRIS, Jr., Bobby Minard,
George C. Moore,
Plaintiffs-Appellants,**

v.

**BIRMINGHAM BOARD OF EDUCA-
TION, Defendant-Appellee.**

No. 82–7155.

United States Court of Appeals,
Eleventh Circuit.

Aug. 22, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 5, 1983.

Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiffs-appellants.

Harry L. Hopkins, Peyton Lacy, Jr., Birmingham, Ala., for defendant-appellee.

Before FAY, HENDERSON and HATCHETT, Circuit Judges.

HATCHETT, Circuit Judge:

In this Title VII discrimination in employment case, we must determine whether the trial court erred in finding that appellants were not victims of hiring or promotion discrimination because of their race. Finding that the trial court, 537 F.Supp.

716, was clearly erroneous in its findings as to one appellant, we affirm in part, and reverse in part.

## FACTS

Rufus Harris, George Moore, and Bobby Minard, are black teacher-coaches in the Birmingham, Alabama, school system. Each has served as an assistant football coach. Moore has also served as a head basketball coach. They claim that the Birmingham Board of Education (BOE) discriminated against them, and other black coaches, by hiring them to head coach and assistant coach positions only in black schools.

### A. Harris's Individual Claim

In 1971, Bill Harris, white athletic director, selected Rufus Harris to transfer to Ramsey High School to become the school's first black assistant coach. Harris, unhappy with the decision, orally requested a return to historically black Carver High School at the end of the school year. His request was granted. Upon his return to Carver, Harris served as an assistant football coach. In 1972, when the head football coach position became vacant, James Lowe, the black principal, told Harris that he would be recommended to fill the vacancy. Instead, the principal selected Willie Peake, a black coach. Harris was later replaced as assistant coach by another black coach. Harris claims his transfer to Carver and subsequent discharge were racially motivated. We find nothing in the record to support such a finding.

### B. Minard's Individual Claim

In the spring of 1973, E.B. Thompson, the black principal of Parker High School, began searching for a head football coach. Minard was an assistant football coach at Parker High during the 1972–73 school year. Minard, however, never formally expressed an interest in the head coach position to Thompson. Subsequently, Cecil Leonard, a black, was chosen for the job. Minard, assuming that he had been excluded from the staff, did not participate in spring training. He was replaced by Wendell Jones and Alvin Griffin, black assistant coaches. Minard later requested a transfer to Glenn, Carver, or Jackson-Olin High Schools, to teach driver education. Board director, Dr. Goodson, a black, offered Minard the choice of four elementary schools. Minard selected Lewis Elementary, where he taught physical education. Later, he transferred to Glenn High School. During Minard's tenure at Glenn High he never applied for any of several coaching positions. Minard claims that his assignment and discharge from Parker High was racially motivated. Examination of the record reveals no support for these charges.

### C. Moore's Individual Claim

In 1973, the head football coach position at Jones Valley High School became vacant. The duty to find a replacement fell to Simpson Pepper, the white principal of Jones Valley High School. Pepper turned to Bill Harris, the Board's athletic director, to assist him in the search for a head football coach. During their search, however, they did not consider Moore for the position. Pepper indicated that he assumed that Moore was happy as head basketball coach and therefore did not consider Moore. Pepper stated the Board had a long standing policy against an individual holding head football and head basketball coaching positions. Bill Harris recommended Herbert Bruce, the disenchanted white head football coach at Phillips High School to fill the Jones Valley vacancy.

Phillips High is a predominantly black high school. During his term as coach at Phillips, Bruce experienced problems maintaining and building its football program. Billy T. Marsh, the white principal of Phillips High, wanted Bruce replaced by a black head football coach. Bruce wanted the head coach position at predominantly white Jones Valley. Pepper, principal at Jones Valley, hired Bruce. This created a head football coaching vacancy at Phillips. When Marsh turned to Bill Harris for advice, Harris suggested Moore.

After an interview, Marsh offered the head football coach job to Moore. Moore requested Harris and Minard as his assist-

ants. Marsh denied the request. Moore later rejected Marsh's offer. Moore spent the 1973–74 school year at Jones Valley High as an assistant football coach and head basketball coach. A year later, at Bruce's request, Moore resigned as assistant football coach. By 1975, historically white Jones Valley High had enrolled a large number of black students. Bruce, again dissatisfied, left Jones Valley High after two years as head football coach. He transferred to predominantly white Gardendale High School in the Jefferson County school system. John Galloway, one of Bruce's white assistant coaches, replaced him at Jones Valley. Pepper, in reaching his decision to hire Galloway again assumed Moore's lack of interest in a head football coach position. Pepper based this assumption on Moore's refusal to serve as head football coach at Phillips. Moore claims the decision not to consider him was racially motivated.

## DISCUSSION

The appellants instituted this Title VII action after receiving a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC). The EEOC investigation revealed a pattern of discrimination in the hiring of head coaches within the Birmingham school system.[1]

Appellants, Rufus Harris, Bobby Minard, and George Moore, instituted this action

under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. The appellants alleged that the appellee, Birmingham Board of Education, discriminates in the hiring and promotion of black coaches within the school system. After instituting this action, the appellants sought class certification. The district court denied class certification because of possible conflicts between the class and the class representatives. During the trial on the merits, at the close of appellants' evidence, the BOE moved to dismiss under rule 41(b), Fed.R. Civ.P. After considering the evidence, the district court granted dismissal under rule 41(b).[2] The district court, in reaching its conclusions, gave no weight to the findings of the EEOC, citing *Smith v. Universal Service, Inc.,* 454 F.2d 154 (5th Cir.1972). The district court additionally determined that proof of the existence of past discriminatory acts under the desegregation orders in *Armstrong v. Birmingham Bd. of Education,* 430 F.Supp. 595 (N.D.Ala.1977), was not sufficient to shift the burden of rebutting the charges of individual discrimination to the Board. We review the case to determine whether class certification was properly denied and whether the trial court's findings are proper and in accord with controlling principles of law.

Moore, Harris, and Minard introduced into evidence a statistical study to sustain

1. On July 3, 1973, the American Federation of Teachers (AFT) filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC), on behalf of Moore and Harris. The charges allege that: "black coaches were discriminated against in promotions to head coaching positions; are transferred with promises of promotions which never materialize; are not allowed to choose their own staff; and other indicia of discrimination exists within the athletic programs of predominantly black schools." The EEOC, after investigating the charges, issued a right-to-sue letter to the AFT, Harris, and Moore. Though Minard was not listed as an aggrieved party in the AFT charge, he did supply the EEOC with an affidavit regarding his claims of discriminatory conduct. The district court correctly concluded that Minard's claims fell within the periphery of the issues raised by the AFT charges and investigated by the EEOC. On December 20,

1978, after the complaint had been amended several times, the American Federation of Teachers was dismissed as a party.

2. Five years after this suit was filed, the parties and the court discussed whether it was necessary for the appellants to intervene in *Armstrong v. Birmingham Board of Education,* 430 F.Supp. 595 (N.D.Ala.1977), popularly known as, the Birmingham school case. The Board of Education never moved to dismiss on the ground that intervention was necessary and, the trial court never ruled on the issue until the case had been heard on the merits. While it is not absolutely clear, it appears that the appellants and the appellees agreed to proceed in this case as an independent suit not required to be consolidated with the Armstrong case. Moore's claim for direct acts of discrimination against him need not be pursued in the Armstrong case.

their contentions.[3] The study revealed that prior to 1968, the coaching staffs of Birmingham were formally and totally segregated by race. By the 1970–71 school year, the segregated profile changed little. During the 1970–71 school year, out of fifty-four (54) head football coaches, only one black coach was assigned to a historically white school and only one white coach was assigned to a historically black school. By the 1972–73 school year, three black assistant coaches were assigned to historically white schools which had become increasingly black through court ordered desegregation, and two white assistant coaches were assigned to historically black schools. During the same school year, no black head football coaches were assigned to historically white schools, nor were any white head football coaches assigned to historically black schools. Only once in a ten-year period (1970–80), was a white head football coach replaced by a black head football coach and that occurred at a school which eventually became predominantly black.

Between 1970 and 1980, the hiring pattern of head basketball coaches reflected this same trend. For instance, seventeen (17) head basketball coach vacancies occurred between 1970 and 1980 at historically white schools. When these vacancies occurred, white coaches replaced white coaches in all but three instances. In those three instances, the historically white schools had become predominantly black. Moore was one of the three black coaches to replace a white coach. This evidence reveals that the BOE followed a consistent pattern of assigning black coaches at predominantly black schools and assigning white coaches at predominantly, or historically, white schools.

The evidence shows that the hiring procedure for coaches does not entail posting advertisements or any formal notification of job vacancies. Rather, coaches, or prospective coaches, must hear of promotional opportunities, if at all, by person-to-person communications. Selection criteria are neither uniform nor written.

The process begins when the athletic director is notified by the principal of a high school that a vacancy will exist. Bill Harris, the athletic director, then reviews all assistant coaches within the school system and chooses several for referral to the principal. The principal of the school having the vacancy may also solicit and interview persons not referred by the athletic director. In terms of hiring priority, assistant coaches on the existing staffs are considered first and candidates outside the school system are considered last. Principals have sole authority to promote assistant coaches to the head coach position. The athletic director and the principal, however, must concur in the hiring of candidates from outside the school system. The appellants contend that this subjective hiring process contributes to the discriminatory hiring and promotional activities and policies of the Board.

## ANALYSIS

■ In addressing these contentions, we are mindful of the "clearly erroneous" standard of rule 52(a), Fed.R.Civ.P. in reviewing the district court's findings of fact. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Hardin v. Stynchcomb,* 691 F.2d 1364, 1372 (11th Cir.1982). We are, however, equally mindful that the clearly erroneous standard does not apply to findings made under an erroneous view of controlling legal principles. *Lincoln v. Board of Regents of the University System of Ga.,* 697 F.2d 928, 939–40 (11th Cir.1983); *Rowe v. General Motors Corp.,* 457 F.2d 348, 356 n. 15 (5th Cir.1972).

The district court dismissed this action under rule 41(b), Fed.R.Civ.P., which provides, in pertinent part:

**3.** The "statistics" are compiled from raw numbers introduced into evidence as exhibits. The exhibits were compiled from the Board of Education's answers to interrogatories. Although the Board speaks of this evidence as "untrustworthy," the Board fails to point out how the statistics are incorrect, and in its brief argues the same statistics.

(b) Involuntary Dismissal: Effect Thereof. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

In a case under Title VII of the Civil Rights Act of 1964 alleging discriminatory treatment in employment, the basic allocation of burdens and order of presentation of proof is as follows: First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must have an opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207, 215 (1981). The phrase "prima facie case" may denote not only the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue.

*Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court described an appropriate model for a prima facie case of racial discrimination. The Court stated that the plaintiff must show:

(i) that he belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications

While the Court specified the prima facie case in the above terms, it was careful to note that such proof is not necessarily applicable in every respect to differing factual situations. *McDonnell Douglas Corp.,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The prima facie case method suggested in *McDonnell Douglas* "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). To rebut this presumption, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094; *Smith v. State of Georgia,* 684 F.2d 729, 733 (11th Cir.1982). In other words, the defendant must "[introduce] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Smith,* 684 F.2d at 733. Because the appellants and the BOE presented evidence to the district court before the appellants rested their case, the court was in a position to decide the factual issues. The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *United States Post-*

al Service Board of Governors v. Aikens, —— U.S. ——, ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983), *quoting Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The record reveals that no objective standards or policies were promulgated by the BOE regarding the hiring of head coaches within the Birmingham school system. We find that this lack of objective hiring standards contributed to Moore's establishment of a prima facie case. This court has previously stated that "[t]he failure to establish fixed or reasonably objective standards or procedures for hiring is a discriminatory practice." *Watson v. National Linen Service,* 686 F.2d 877, 881 (11th Cir.1982). The former Fifth Circuit has repeatedly held that subjective selection processes involving white supervisors provide a ready mechanism for racial discrimination. *Parson v. Kaiser Aluminum & Chemical Corp.,* 575 F.2d 1374, 1385 (5th Cir.1978), *cert. denied,* 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). The record reveals that in Moore's case both the principal and athletic director are white. In addition to Moore's direct proof, the record indicates that the BOE has an immediate past history of racial discrimination and is still operating under the desegregation orders of *Armstrong v. Birmingham Board of Education,* 430 F.Supp. 595 (N.D.Ala.1977). This circuit has also stated that "[p]roof of an immediate past history of racial discrimination alone can be sufficient to shift to the local board of education the burden of justifying its employment decisions by clear and convincing evidence." *Lee v. Conecuh County Board of Education,* 634 F.2d 959, 963 (5th Cir. 1981); *Lee v. Washington County Board of Education,* 625 F.2d 1235, 1237 (5th Cir. 1980); *Hardy v. Porter,* 613 F.2d 112, 114 (5th Cir.1980).

In both *Lee v. Conecuh County* and *Lee v. Washington County,* the school boards had recently converted from racially dual school systems. Implicit in the holdings is that proof of an immediate past history of racial discrimination may be established by showing the existence of various desegregation orders. The statistical evidence, the showing of only subjective hiring standards and the history of past racial discrimination was enough to compel a finding of employment discrimination as to Moore. The Birmingham school system fails to post coaching vacancies, lacks objective standards by which to evaluate competing candidates, uses principals's recommendations without objective criteria, has a history of racial discrimination in the employment and assignment of black teachers, and admits that statistically it appears that coaches have been assigned to schools according to the racial composition of the schools. With these findings, it is easy to hold that Moore has been the victim of employment discrimination.

Once Moore had established a prima facie case, to rebut that presumption BOE had to clearly set forth, through the introduction of admissible evidence the reasons for Moore's rejection. The Board had to produce evidence that Moore was rejected or someone else was preferred, for a legitimate nondiscriminatory reason. *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403. The Board never attempted to show that Bruce was preferred over Moore because of superior qualifications. Nor did it give any other legitimate nondiscriminatory reason. The reason Moore was rejected, according to the Board's evidence, is because of the false assumption by one of its agents that he was not interested in a head football coaching position. The situation in which the Board placed itself is caused by the selection process utilized. Under such a procedure, no legitimate reason can be shown. Moore never had the opportunity to apply for the head coach position at Jones Valley, and therefore, never was brought into competition for the position with white coaches. The reason given by the Board thus became legally insufficient and illegitimate.[4]

---

4. The offer to appoint Moore head football coach at Phillips High can never serve to remedy the employment discrimination violation

which occurred when Moore was not considered for the head football coaching position at Jones Valley. Once the discriminatory act

Title VII, Supreme Court precedent, and our holdings would be rendered a farce if a public employer, without notification of job opportunity procedures, without uniform criteria for determining qualifications, and with a totally subjective system of selection could rebut a prima facie case by a prospective employee of the protected class by showing that the employee never had the opportunity to learn of and apply for the job.

[11] As a general rule, a court should not grant a defendant's rule 41(b) motion at the close of the plaintiff's case, but should allow the defendant to introduce evidence before entering a final judgment. *Riegel Fiber Corp. v. Anderson Gin Co.,* 512 F.2d 784, 793 (5th Cir.1975); *White v. Rimrock Tidelands, Inc.,* 414 F.2d 1336, 1340 (5th Cir.1969). Only in those instances where the plaintiff has not met his burden should rule 41(b) dismissal be granted. *Riegel Fiber Corp. v. Anderson Gin Co.*

The appellants additionally raise the issue of the district court's denial of class action certification. We find no merit to the appellants' arguments on this issue, and thus affirm the district court's denial of class certification.

## CONCLUSION

We hold that the trial court's finding on the ultimate issue of discrimination is clearly erroneous and that the case was decided under an erroneous view of the controlling law regarding the weight to be given to past history of discrimination, lack of standards, and lack of objective criteria for hiring and promotion. Having so concluded, we reverse the district court's dismissal under rule 41(b), Fed.R.Civ.P., and remand this case to the district court for further proceedings on the merits in Moore's case.

AFFIRMED IN PART, REVERSED IN PART and REMANDED for further proceedings.

occurred because of the purely subjective hiring policies of the Birmingham school system,