**Joe L. LUJAN, Plaintiff-Appellant,**

v.

**FRANKLIN COUNTY BOARD OF EDUCATION, et al., Defendants-Appellees.**

No. 84–5397.

United States Court of Appeals,
Sixth Circuit.

Argued March 6, 1985.

Decided June 17, 1985.

918

Mary Juanita Presley, Robert Belton (argued), Nashville, Tenn., for plaintiff-appellant.

Ben P. Lynch (argued), Winchester, Tenn., for defendants-appellees.

Before CONTIE, Circuit Judge, and PHILLIPS and CELEBREZZE, Senior Circuit Judges.

CONTIE, Circuit Judge.

Joe Lujan appeals the district court's judgment in favor of the defendants, the Franklin County Board of Education and Howard M. Hannah, the former Superintendent of Schools of Franklin County, Tennessee. Lujan's complaint alleged that the defendants' failure to hire him as the head football coach at Franklin County High School violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The complaint also alleged a claim under 42 U.S.C. § 1983. The district court's decision is reported at 584 F.Supp. 279 (E.D.Tenn.1984). We affirm.

### I.

Joe Lujan, who is of black and hispanic parentage, was first employed by the Board of Education in 1949. At that time, Franklin County operated segregated schools and Lujan worked at Townsend High School, an all black school. From 1949 to 1966, Lujan, in addition to his teaching duties, was the head football and basketball coach at Townsend. Litigation to force desegregation began in the early 1960's and led to the closing of Townsend High in 1966. *See Hill v. Franklin Coun-*

*ty Board of Education,* 232 F.Supp. 671 (E.D.Tenn.1964). The Board gave Lujan a comparable teaching position at the newly desegregated Franklin County High School, a formerly all white school. Since the Board of Education did not need two head football and basketball coaches at one school, it employed Lujan as an assistant coach for those sports. The district court found that although Lujan's coaching supplement was unchanged, his responsibilities were substantially less at Franklin County High than they had been at Townsend.

In 1971 and 1979, the Board had openings for a head basketball coach at Franklin County High and Huntland High, respectively. In both instances, the Board hired Rodney Rogers, who is white. The Board did not advertise or take formal applications for these positions but instead hired Rogers through rather informal procedures. The coaching position at issue in this case became open during the 1978–79 school year when the Board decided not to renew the contract of its then current head football coach. The Board publicized the opening by having stories placed in several newspapers. A total of 17 persons, including Lujan, applied for the job. The Board narrowed the field to a group of five to eight applicants for further evaluation. Lujan, and all other assistant coaches who applied for the vacancy, were among this group. Superintendent Hannah checked the applicants' references and made a recommendation to the Board. After interviewing the entire group of finalists, the Board followed Hannah's recommendation and hired Harold "Red" Roberts, who is white.

The district court held that Lujan's § 1983 claim was barred by the applicable statute of limitations and that only Lujan's Title VII claim for the failure to hire him as head football coach in 1979 would be considered. Lujan does not challenge this ruling on appeal. Allocating the burden of proof in accordance with *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the court found that the defendants

had offered a legitimate nondiscriminatory reason for the decision to choose Red Roberts over Lujan and that Lujan failed to prove that the reasons asserted by the Board were pretextual. Accordingly, judgment was entered for the defendants. *See* 584 F.Supp. at 281–82.

## II.

Lujan does not challenge the district court's factual findings as being clearly erroneous. Rather, he argues that the district court evaluated this case under improper legal standards. Specifically, he argues that school personnel displaced or demoted as a result of desegregation are entitled to what have become known as "*Singleton* rights." *See Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir.1969) (en banc), *rev'd in part on other grounds sub nom. Carter v. West Feliciana Parish School Board*, 396 U.S. 290, 90 S.Ct. 603, 24 L.Ed.2d 530, *cert. denied*, 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 530, *opinion on remand*, 425 F.2d 1211 (5th Cir.1970) (en banc). These *Singleton* rights, Lujan asserts, include a right to be offered the first vacant job which would place him in a position comparable to that which he held prior to desegregation. Second, he asserts that in employment discrimination cases against schools which historically have been segregated, the burden of persuasion, and not merely the burden of production, shifts to the defendant if the plaintiff establishes a prima facie case of discrimination. Finally, Lujan argues that the defendants did not articulate a legally sufficient nondiscriminatory reason for not hiring him.

## III.

In *Singleton*, the Fifth Circuit prescribed certain general provisions to be used in desegregation injunctions. With regard to faculty and staff displacements, injunctions were to provide:

> If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable nondiscriminatory standards from among all the staff of the school district. In addition *if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.*
>
> Prior to such a reduction, the school board will develop or require the development of non-racial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.
>
> "Demotion" as used above includes any reassignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period.

*See* 419 F.2d at 1218 (emphasis added).

Lujan contends, and the district court found, that the diminution in his coaching responsibilities following desegregation constituted a "demotion" and that he was generally qualified for the head coaching

position which became open in 1979. These findings, Lujan argues, are sufficient to compel the conclusion that he was entitled to the job of head football coach in 1979. The district court held, however, that *Singleton* rights may not be asserted in an action brought solely under Title VII.

Although we agree with the district court, we expand somewhat upon its reasoning. First, we conclude that Lujan has failed to show that he had any *Singleton* rights, or, stated differently, that the Board was subject to the duties imposed in *Singleton*. Second, even had those rights and duties attached, they could not be enforced in Title VII litigation.

### A.

■ For a number of years, court opinions have contained loose language referring to *Singleton* rights as if those rights rested upon a constitutional or statutory footing. *See Cousin v. Board of Trustees of Houston Municipal Separate School District*, 726 F.2d 262, 267 (5th Cir.1984) (collecting cases). Other courts have correctly observed, however, that *Singleton* rights arise only by virtue of an injunction using the principles expressed in *Singleton*. In a case in which the plaintiff argued that *Singleton* rights are of constitutional dimension, the Fifth Circuit held that these

> arguments rest on a misapprehension of the nature of the *Singleton* provisions relating to displacements caused by integration. *Singleton* entitlements are not constitutional rights. Both the requirement that displacements be affected only in accordance with written, objective criteria and the requirement that displaced personnel be given a right of first refusal of subsequent vacancies are standards of conduct imposed upon school boards under court order. They are aspects of equitable remedies, designed by this court under its general equitable power to fashion relief for constitutional violations ... in accordance with principles of fairness and with a minimum of hardship

to persons affected by large scale, court-ordered social change.

*Hardy v. Porter*, 546 F.2d 1165, 1168 (5th Cir.1977).

The Fifth Circuit authoritatively clarified the nature of *Singleton* rights in *Cousin*. The defendant school system in that case had begun voluntary desegregation before the imposition of any court order. As a result of this voluntary action, the plaintiff was demoted. *See* 726 F.2d at 264. After the demotion, a lawsuit was filed and desegregation then proceeded under a court order which contained the *Singleton* prescriptions. The injunction was dissolved approximately sixteen months later when the district court determined that the system had attained a unitary status. *Id.* at 264–65. The defendant argued that since the plaintiff had been demoted before the imposition of a *Singleton* injunction, he was not entitled to the *Singleton* right of recall. The court agreed that *Singleton* rights are "limited remedial devices appurtenant to an injunction." *See id.* at 268. In teaching this conclusion, the court defined the precise nature of *Singleton* rights as follows:

> Despite the fact that some of our cases refer to *Singleton* rights as "law" or as being "constitutional," the inescapable fact is that an overwhelming number of cases apply *Singleton III* principles in court-ordered desegregation situations. If *Singleton* rights are "law," then, they are law only in the sense that any injunction creates a law of the case, just as binding on the parties to the injunction as if it were statutory or constitutional. Although a meritorious *Singleton* claim also may be meritorious under the civil rights statutes or the fourteenth amendment, *Singleton III* does not create or embody separate substantive rights existing apart from the judicial orders that create the displacement damage *Singleton* attempted to mitigate.

*Id.* at 267–68 (footnote omitted). Since the Fifth Circuit authored *Singleton*, we regard that circuit's later pronouncements on the subject as highly persuasive authority.

Accordingly, we adopt the Fifth Circuit's holding that *Singleton* rights exist only insofar as a school system is subject to a valid *Singleton* order.

█ Lujan does not argue that the district court supervising the Franklin County desegregation case ever imposed a *Singleton* injunction.[1] Instead, he relies upon a document issue by the United States Department of Health, Education and Welfare to "all Chief State School Officers and School Superintendents." Lujan argues that this document imposed *Singleton* duties upon the Board. Assuming that a school district could be put under a *Singleton* duty by an order of the Department of Health, Education and Welfare as well as by a court order, we conclude that the document cited by Lujan was insufficient to create *Singleton* duties.

The document relied upon by Lujan purports to rest upon the powers granted to the Department by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which prohibits federal aid to programs engaging in discrimination. Section 2000d–1 provides that each agency disbursing funds may issue "rules, regulations, or orders of general applicability" to effectuate the antidiscrimination provisions. The President must specifically approve each rule, regulation or order. *See id.*[2] Lujan has failed to demonstrate that the document he relies upon was intended to be, or was effective as, a formal order. First, it is not denominated as such. Instead, it merely is styled as a "Memorandum." Second, the memorandum merely "describes

HEW policies" and is devoid of mandatory language. Third, the specific passage relied upon states only that "courts have also held that persons demoted as an incident to the desegregation process are to be given preference in future promotions." The memorandum does not say, however, that the failure to do so constitutes discrimination. This language is far from what one would expect an agency to use in ordering someone to take action upon the pain of losing federal funding.[3] Finally, Lujan made no effort to show that this document had been approved by the President, a prerequisite to its validity as a binding general order under 42 U.S.C. 2000d–1. Accordingly, assuming that the Department had the authority to impose *Singleton* duties upon the Board, we conclude that the document relied upon by Lujan was ineffective to do so. Lujan therefore had no *Singleton* rights.

**B.**

We also conclude that even if the Board had a *Singleton* duty to give preferences to displaced personnel, a violation of that duty may not be remedied in litigation brought solely under Title VII. This conclusion necessarily follows from an analysis of the nature of *Singleton* rights and the scope of relief available under Title VII.

█ Under *Singleton*, Lujan would be absolutely entitled to the head coaching position which opened in 1979 without regard to whether either the 1966 demotion or the 1979 failure to promote were moti-

---

1. Indeed, the injunction in this case was entered well before the 1969 *Singleton* decision. *See Hill v. Franklin County Board of Education*, 232 F.Supp. 671 (E.D.Tenn.1964).

2. The President's authority to approve these orders has since been delegated to the Attorney General. *See* Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (1980).

3. In contrast, the Department has imposed *Singleton* duties under a "compliance agreement," which expressly "required the district to comply with ... *Singleton." See Barnes v. Jones County School District*, 544 F.2d 804, 805 (5th Cir.1977). Two points distinguish the instant memoran-

dum from the compliance agreement in *Barnes*. First, the agreement in *Barnes* expressly referred to the relevant portion of *Singleton*. Second, the school system in *Barnes* voluntarily "entered into," *see id.* at 805, the agreement as a quid pro quo for receiving federal funds. Here, the memorandum is unilateral; that is, the Board of Education did not agree, as it did in *Barnes*, to be bound by *Singleton. Cf. Guardians Association v. Civil Service Commission of New York*, 463 U.S. 582, 596–97, 103 S.Ct. 3221, 3229, 77 L.Ed.2d 866 (1983) (plurality opinion) (due to consensual nature of a recipient's obligations under Spending Clause legislation, make-whole relief not ordinarily available to private litigants).

vated by racial discrimination. *Singleton* rights are not mere remedies for victims of discrimination. Rather, they accord a preference to a certain class of persons: those who were displaced, not by discrimination, but by the historical forces of desegregation. *See Hardy*, 546 F.2d at 1168 (*Singleton* rights are equitable remedies designed to give relief for constitutional violations "with a minimum of hardship to persons affected by large scale, court-ordered social change").

■ The preferential treatment given to a particular class of persons under *Singleton* sharply contrasts with the more limited protections of Title VII. The sole question in a Title VII case is, quite simply, whether "the defendant intentionally discriminated against the plaintiff." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093).[4] The Court has recently emphasized § 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), which forbids court-ordered relief to any person who "was refused ... advancement ... for any reason other than discrimination." *See Firefighters Local Union No. 1784 v. Stotts*, —— U.S. ——, 104 S.Ct. 2576, 2588–90, 81 L.Ed.2d 483 (1984). In construing § 706(g), the Court noted legislative history to the effect that "[u]nder title VII, not even a Court, much less the Commission, could order ... the hiring, reinstatement, admission to membership or payment of back pay for anyone who is not discriminated against in violation of this title." *Id.* at 2590 (quoting 110 Cong.Rec. 14464). It then held that Title VII is "to provide make-whole relief only to those who have been actual victims of illegal discrimination." 104 S.Ct. at 2589.

■ Clearly, then, what Lujan seeks in the name of *Singleton* may not be obtained under Title VII.[5] While a person might have a right to recall under a *Singleton* injunction and also have a right to relief under Title VII, he does not obtain the latter *by virtue of* the former. Rather, a plaintiff must prove that he was a victim of discrimination in order to assert a right to relief under Title VII. *Cf. Cousin* at 726 F.2d at 267 (the confusion over *Singleton* rights "may stem in part from the fact that the same events may give rise to *Singleton* claims as well as to statutory civil rights claims").[6]

■ To summarize, Lujan has not shown that the Board was subject to the dictates of *Singleton* either by force of a court order or by the memorandum from the Department of Health, Education and Welfare. Under *Cousin*, then, Lujan had

---

**4.** Of course, slightly different questions are presented when the plaintiff alleges that minorities are unfairly treated by a facially neutral employment practice. *See Burdine*, 450 U.S. at 252 n. 5, 101 S.Ct. at 1093 n. 5.

**5.** Lujan sought injunctive relief as well as other remedies. Although we recognize that some courts have held that an injunction is proper where a pattern or practice of illegal discrimination is shown even if the plaintiff before the court was not a victim of discrimination, *see Evans v. Harnett County Board of Education*, 684 F.2d 304, 306 (4th Cir.1982), that principle does not apply to this case. As will be discussed below, Lujan failed to prove either individual discrimination or a pattern or practice of discrimination. Thus, there was nothing to enjoin.

**6.** We also note a third problem with Lujan's *Singleton* claim. The document upon which Lujan relies purports to rest on Title VI, not Title VII. A violation of a duty imposed by that order would, then, be a violation of Title VI but not, *ipso facto*, of Title VII. Although a violation of a valid Title VI *Singleton* order might also be a violation of Title VII, the latter conclusion would follow only if a violation of Title VII were proven. If it is true that a *Singleton* duty may arise under Title VI, then it must also be true that not every violation of Title VI is also a violation of Title VII. This necessarily results, since, as we concluded above, the *Singleton* preference exceeds the protections of Title VII. Thus, again assuming a valid *Singleton* order under Title VI, the proper vehicle to redress violations of that order would be a private cause of action under Title VI or, perhaps, an action under § 1983. *See Guardians Association v. Civil Service Commission of New York*, 463 U.S. 582, 594–95, 103 S.Ct. 3221, 3228–3229, 77 L.Ed.2d 866 (1983) (plurality opinion). Since Lujan never in any way asserted a Title VI claim and since his § 1983 claim is time barred, Lujan's *Singleton* claim faces pleading problems as well as the others noted in the text.

no *Singleton* rights. In the alternative, even assuming that the Board was subject to a *Singleton* duty, Lujan may obtain no relief in this Title VII action because Title VII forbids court-ordered remedies for those who are not the actual victims of discrimination.[7] Thus, Lujan can obtain the relief he seeks only if he can prove actual discrimination.

## IV.

Lujan's second argument is that because of the Board's history of segregation, the burden of persuasion, not merely of production, should have shifted to the defendants upon the establishment of a prima facie case. Lujan cites numerous cases to support this proposition. *See, e.g., Knighton v. Laurens County School District No. 56,* 721 F.2d 976, 978 (4th Cir.1983); *Harris v. Birmingham Board of Education,* 712 F.2d 1377, 1383 (11th Cir.1983); *Evans v. Harnett County Board of Education,* 684 F.2d 304, 307 (4th Cir.1982); *Lee v. Conecuh County Board of Education,* 634 F.2d 959, 963 (5th Cir.1981); *Castaneda v. Pickard,* 648 F.2d 989, 994 (5th Cir.1981); *Hardy v. Porter,* 613 F.2d 112, 114 (5th Cir.1980); *McFerren v. County Board of Education,* 455 F.2d 199, 201 (6th Cir.), *cert. denied,* 407 U.S. 934, 92 S.Ct. 2461, 32 L.Ed.2d 817 (1972); *Rolfe v. County Board of Education,* 391 F.2d 77, 80 (6th Cir.1968); *Chambers v. Hendersonville City Board of Education,* 364 F.2d 189, 192 (4th Cir.1966) (en banc). Since these cases do state this principle in various forms [8] and apply it under various circumstances, the obvious question is to what extent these cases are consistent with *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[9] The district court held that since this case proceeded solely under Title VII, the *Burdine* allocation of the burden of proof would control.

Once again, we agree with the district court's result but our conclusion rests on slightly different reasoning. We conclude that *Burdine* does state a rule generally applicable to Title VII cases, including those connected to prior school desegregation. The Supreme Court has, however, shifted the burden of persuasion to the defendant in cases involving either a pattern or practice of employment discrimination or a disparate impact upon minorities. A number of cases relied upon by Lujan can be reconciled with *Burdine* by analyzing them in terms of the Supreme Court's pattern or practice and disparate impact cases. Some of the other cases relied upon by Lujan, however, sanction shifting the burden of persuasion to the defendant in a manner inconsistent with both *Burdine* and the pattern or practice and disparate impact cases. Finally, Lujan's claim falls within the standard rule for disparate treatment cases announced in *Burdine* and the district court therefore correctly allocated the burden of persuasion.

## A.

An analysis of this historical roots of the doctrine relied upon by Lujan clarifies the issue greatly. Thorough research of the authority cited by Lujan reveals that the burden-shifting principle stems from the Fourth Circuit's decision in *Chambers.*

---

**7.** This is not to say *Stotts* renders *Singleton* rights unenforceable. We hold only that *Singleton* rights may not be vindicated in an action brought solely under Title VII. We also note that our comments about the scope of relief available under Title VII apply only to coercive remedies and not to *Singleton* -type preferences which a school Board might voluntarily grant. *See Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 486–89 (6th Cir.1985).

**8.** Some cases state that the burden of persuasion is upon the defendant to justify its actions by "clear and convincing" evidence, *see, e.g., Chambers,* 364 F.2d at 192, while others merely state that the burden of persuasion is upon the defendant without requiring a higher standard of proof, *see, e.g., Rolfe,* 391 F.2d at 80.

**9.** One of the cases cited by Lujan simply does not contain the proposition. *See Hatton v. Board of Education,* 422 F.2d 457 (6th Cir.1970). Another case, *Harris,* is ambiguous. That case both cites *Burdine, see* 712 F.2d at 1382, and quotes with approval prior Fifth Circuit cases which shift the burden of persuasion to the defendant, *see id.* at 1383.

The cases in this circuit which have employed the burden-shifting device are *Rolfe* and *McFerren*. *McFerren*, the later case, cites only *Rolfe* and *Chambers*. *See McFerren*, 455 F.2d at 201. *Rolfe*, in turn, cites only *Chambers*. *See Rolfe*, 391 F.2d at 80. In the Fourth Circuit, the relatively recent cases of *Knighton* and *Evans* rely upon that circuit's prior decision in *Chambers* and on *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the relevance of which will be discussed later. *See Knighton*, 721 F.2d at 978; *Evans*, 684 F.2d at 307. In the Fifth Circuit, the story is much the same. The principle appears in *Barnes v. Jones County School District*, 544 F.2d 804, 807 (5th Cir.1977). *Barnes* relies upon *Baker v. Columbus Municipal Separate School District*, 329 F.Supp. 706 (N.D.Miss.1971), *aff'd*, 462 F.2d 1112 (5th Cir.1972); *Williams v. Kimbrough*, 295 F.Supp. 578 (W.D.La.), *aff'd*, 415 F.2d 874 (5th Cir. 1969), *cert. denied*, 396 U.S. 1061, 90 S.Ct. 753, 24 L.Ed.2d 755 (1970), and *Keyes*.[10] *Baker* cites an unpublished decision, *Chambers* and *Rolfe*. *See* 329 F.Supp. at 720. On a related point, *Baker* cites *Chambers* and other cases which cite only *Chambers*. *See id.* at 719. *Kimbrough* also cites only cases which rely solely on *Chambers*. *See* 295 F.Supp. at 585. Later Fifth Circuit cases stem from *Barnes*. *See, e.g., Castaneda*, 648 F.2d at 994.[11]

As noted above, a number of cases rely on *Keyes*, a Supreme Court case, in addition to *Chambers*. *See, e.g., Evans*, 684 F.2d at 307. One of the few courts to attempt a reconciliation of the *Chambers* principle with *Burdine* holds that *Burdine* is inapplicable to Title VII cases involving previously segregated schools because the cases allowing a shifting of the burden of persuasion stem from a separate line of Supreme court authority, namely *Keyes*. *See Castaneda*, 648 F.2d at 994 n. 2. In *Keyes*, the Supreme Court held that when a "meaningful portion" of a single school system is found to be segregated by intentional action (that is, when *de jure* segregation is shown), the burden shifts to the defendant to prove that other areas within the system which are in fact segregated are not also the result of intentional segregation. *See* 413 U.S. at 208, 93 S.Ct. at 2697. To support this holding, the Court found an analogy in cases ruling that "in a school system with a history of segregation, the discharge of a disproportionately large number of Negro teachers incident to desegregation 'thrust[s] upon the School Board the burden of justifying its conduct by clear and convincing evidence.'" *Id.* at 209, 93 S.Ct. at 2697. The case which the Supreme Court cited and quoted was *Chambers*. The circle stands unbroken.

## B.

The principle that when certain preconditions are met a minority school teacher may shift the burden of persuasion to the defendant is thus firmly established. The cases stemming from *Chambers* have repeatedly applied it and the Supreme Court in *Keyes* has approved it, albeit in dicta.[12] A close reading of *Keyes*, *Chambers* and the earlier cases relying on *Chambers* re-

---

**10.** *Barnes* also cites *Roper v. Effingham City Board of Education*, 528 F.2d 1024 (5th Cir. 1976). *Roper* does state the principle involved, but cites only *United States v. Jefferson County Board of Education*, 380 F.2d 385 (5th Cir.) (en banc), *cert. denied*, 389 U.S. 840, 88 S.Ct. 77, 17 L.Ed.2d 104 (1967), which does not state the principle. *See Price v. Denison Independent School District*, 694 F.2d 334, 375 n. 78 (5th Cir.1982) (tracing the line of cases to *Roper*). The court in *Roper* may have been attempting to cite the Fifth Circuit's earlier decision in the *Jefferson* case. *See* 372 F.2d 836, 887–88 (discussing inferences that may be drawn from numerical disparities, although not expressly addressing burden of persuasion).

**11.** The Fifth Circuit cases also rely on the unattributed proposition in *Roper*. *See supra* note 10. The cases in the Eleventh Circuit follow the Fifth Circuit cases. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (Fifth Circuit cases decided prior to establishment of Eleventh Circuit are binding precedent in Eleventh Circuit); *Harris*, 712 F.2d at 1383 (relying on Fifth Circuit cases).

**12.** *See Price*, 694 F.2d at 376 n. 78 (*Keyes* statement on burden of proof in cases involving a discharged school teacher characterized as dicta); *Barnes*, 544 F.2d at 807 (same).

veals, however, that later cases have loosened the requirements for applying the principle. Although the earlier cases may be reconciled with *Burdine*, some of the later cases cannot. We conclude that the *Chambers* principle remains valid only to the extent that it conforms to its initial use.

*Chambers* involved the "startling decimation of Negro teachers" in the defendant's school system following desegregation. *See* 364 F.2d at 190. In the year the school system desegregated, sixteen out of twenty-four black teachers were not rehired, while "every white teacher who indicated the desire was re-employed together with 14 new white teachers, all of whom were without previous experience." *Id.* In addition, the same standards were not applied to black teachers and white teachers. *Id.* at 191. Under these facts, the court held that "the sudden disproportionate decimation in the ranks of the Negro teachers ... thrust upon the School Board the burden of justifying its conduct by clear and convincing evidence." *Id.* at 192.

■ Shifting the burden of persuasion under these circumstances was what the Supreme Court approved in *Keyes*. Indeed, the court characterized the *Chambers* holding as applying only upon a showing that a school with a history of segregation discharged "a disproportionately large number of Negro teachers." *Keyes*, 413 U.S. at 209, 93 S.Ct. at 2697. *Rolfe* involved only slightly less egregious facts.

In decreasing personnel following desegregation, the defendant discharged five black teachers but no white teachers. *See* 391 F.2d at 79. In addition, fourteen new white teachers were hired into the system in the same school year. *Id.* Finally, in deciding which teachers to release, the Board evaluated only the teachers at an all black school with an all black faculty. *Id.* In such a circumstance, when the discharges fell disproportionately on blacks and, indeed, white teachers were not even considered for discharge, the court applied the *Chambers* rule. *Id.* at 80. *See also McFerren*, 455 F.2d at 200–01 (where fifteen out of twenty-two discharged teachers were black, where all but one of the white teachers discharged had less than two years of service but most of the black teachers discharged had extended periods of service and where new white teachers were later hired, *Chambers* applied); *Baker*, 329 F.Supp. at 719 (where "defendants denied reemployment to a disproportionately large number of black first year teachers" *Chambers* applied). It is therefore clear that the initial practice, and the only practice sanctioned in *Keyes*, was to shift the burden of persuasion where the defendant had a history of discrimination *and* significant numerical disparities were involved.[13]

■ This reading of *Keyes* and the earlier cases is also supported by the cases

---

**13.** The other cases cited by the Supreme Court in *Keyes* also required a showing of numerical disparity in order to shift the burden of persuasion to the defendant. *See North Carolina Teachers Association v. Asheboro City Board of Education*, 393 F.2d 736, 743 n. 11 (4th Cir.1968) (en banc) (reaffirming *Chambers* rule that where there is a "sudden disproportionate decimation in the ranks of Negro teachers" the burden of persuasion shifts); *Bonner v. Texas City Independent School District*, 305 F.Supp. 600, 621 (S.D.Tex.1969) (where a "disproportionate number of Negro teachers were discharged" the burden of persuasion shifts); *Kimbrough*, 295 F.Supp. at 585 ("disproportionate discharges in the ranks of Negro teachers" justifies shifting burden of persuasion). The court also cited *Jefferson*, 372 F.2d at 887–88, a case which does not discuss the burden of persuasion but instead speaks of an inference arising from the percent-

ages of black students in white schools in considering the question of intentional segregation. *See supra* note 10. Finally, the Court cited two cases dealing with faculty segregation. These cases held that when nearly all teachers at all black schools are black teachers and nearly all teachers at white schools are white teachers, the burden of persuasion shifts to the defendant to show that the faculty was not intentionally segregated. *See Davis v. School District*, 309 F.Supp. 734, 743–44 (E.D.Mich.1970), *aff'd*, 443 F.2d 573 (6th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *United States v. School District No. 151*, 301 F.Supp. 201, 228 (N.D.Ill.1969), *aff'd as modified*, 432 F.2d 1147 (7th Cir.1970), *cert. denied*, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971).

Thus, all of the cases relied upon in *Keyes* required significant numerical disparities to shift the burden of persuasion to the defendant.

relied on in *Chambers*. *Chambers* analogized the discharge of a disproportionately large number of black teachers to those cases involving the systematic exclusion of black grand and petit jurors. *See Chambers*, 364 F.2d at 192–93. In such cases, a prima facie case by the defendant places the burden of persuasion on the state to disprove intentional discrimination in the selection of jurors. This burden shifting occurs, however, only upon a showing of disproportionate underrepresentation of blacks on the state's juries. *See Eubanks v. Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); *Reece v. Georgia*, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); *Avery v. Georgia*, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); *Patton v. Mississippi*, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947). Thus, although the equal protection clause is not violated unless intentional discrimination is shown, "[i]t is also not infrequently true that the discriminatory impact—in the jury cases for example, the totally or seriously disproportionate exclusion of Negroes from jury venires—may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

Numerical disparities were clearly the crucial element necessary to shift the burden of persuasion to the defendant in *Chambers, Keyes* and other similar cases of that vintage. Nonetheless, later cases, including *Rolfe*, fail to set forth the requirement of numerical disparity as a precondition to shifting the burden of persuasion. *See* 391 F.2d at 80. The test originally stated in *Chambers* and approved in *Keyes* has become diluted over the years, at least in its restatements if not in all its applications,[14] to the point that a showing that a school system was once ordered to desegregate suffices to place the burden of persuasion on the school to show that the demotion or discharge of a *single* black

teacher was not undertaken with discriminatory intent. *See, e.g., Lee*, 634 F.2d at 963. Since Lujan asks us to apply this diluted rule, we must determine whether the deletion of the numerical disparity requirement in Title VII cases is consistent with *Burdine*.

## C.

*Burdine* is not the only Supreme Court case to discuss the burden of persuasion in Title VII cases. We conclude that cases such as *Chambers* and *Rolfe* can be reconciled with other Title VII cases. Any extension of those cases, which deletes the numerical disparity requirement, cannot.

If one examines the facts of *Chambers* and the actual language of *Keyes*, parallels to other Title VII theories appear. The critical finding in *Chambers* and *Keyes* of disproportionate numerical impact on minorities quickly brings two Title VII theories to mind. First, if a facially neutral employment practice, such as a written test, has a disproportionate impact on minorities, the burden of persuasion shifts to the defendant to show that the test has a "manifest relationship to the employment in question." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). *See Connecticut v. Teal*, 457 U.S. 440, 446–47, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982) (employer must demonstrate relationship of test to employment); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (employer must meet "burden of proving that its tests are 'job related'"). Second, in so-called "pattern or practice cases," if the plaintiff can establish "that racial discrimination was the company's standard operating procedure," *see International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977), the burden of proof shifts to the defendant to show that in individual cases

14. Under the facts of some of the more recent cases, certain applications of the *Chambers* rule appear to be in consonance with our reading of

the Supreme Court's cases governing the burden of proof in Title VII cases. *See infra* note 17.

the hiring decision was not due to the discriminatory policy but to some other, legitimate consideration. *Id.* at 359, 97 S.Ct. at 1866. *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 772, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976); *Craik v. Minnesota State University Board*, 731 F.2d 465, 470–71 (8th Cir.1984). Although pattern or practice cases are a variant of the disparate treatment theory and thus "[p]roof of discriminatory motive is critical," *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, numerical disparities are important in establishing the pattern or practice [15] and the pattern or practice is in turn the crucial element in shifting the burden of persuasion to the defendant. *See id.* at 339, 359 & n. 45, 97 S.Ct. at 1856, 1867 & n. 45.

▮ The range of Title VII theories addressed by the Supreme Court thus reveals two instances in which shifting the burden of persuasion to the defendant is appropriate. In both of these instances, numerical disparity is the key triggering factor. In contrast, where there is but one asserted occasion of discrimination, *Burdine* teaches that the burden of persuasion "remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. In short, were *Chambers* or *Rolfe* to be decided today, the pattern or practice theo-

ry, or, if an obstensibly neutral test were involved, the disparate impact theory, would be invoked.[16] If the plaintiff were unsuccessful in establishing numerical disparity, he might still attempt to show intentional discrimination on an individual basis. Were he to do so, *Burdine* would govern and the burden of persuasion would remain at all times on the plaintiff. *See generally Cooper v. Federal Reserve Bank of Richmond*, —— U.S. ——, 104 S.Ct. 2794, 2799–802, 81 L.Ed.2d 718 (1984) (member of unsuccessful pattern or practice class action suit is not precluded from later asserting individual disparate treatment claim; burden of persuasion governed by *Burdine* ).[17]

## D.

▮ Although this case was tried primarily as an ordinary individual disparate treatment case, Lujan's complaint did contain allegations consistent with a pattern of practice theory. His proof, however, completely failed to show that the Board of Education had a policy of racial discrimination.

Lujan's list of proposed witnesses, submitted in conjunction with the joint pretrial order, included several witnesses who were to testify "to the patterns and practices of discrimination relative to the hiring and

---

**15.** The only alternative to using statistics to demonstrate a pattern or practice would appear to be direct evidence of an intent to discriminate. *See Trans World Airlines, Inc. v. Thurston*, —— U.S. ——, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985) (defendant's admitted employment policy is "discriminatory on its face"). *See also infra* note 16.

**16.** *Rolfe* might also proceed on the theory that the defendant had a hiring policy which was discriminatory on its face. *See supra* note 15. In that case, the defendant evaluated only the teachers of an all black school for discharge and the only teachers of that school were black. The necessary result of the policy was that only black teachers would be discharged. Given such direct evidence of a facially discriminatory policy, the burden of persuasion would shift to the defendant to justify its actions by whatever means available. *See Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556–57 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

**17.** This analysis is consistent with the Fourth Circuit's decision in *Evans*. In that case, the plaintiff proved to the satisfaction of the district court that the defendant had engaged in a pattern or practice of hiring only black principals for black schools and white principals for white schools. *See* 684 F.2d at 306. Given this factual finding and the Supreme Court's holdings in *Teamsters* and *Franks*, the Fourth Circuit was correct in holding that the district court should have placed the burden of persuasion on the defendant to show that the individual hiring decision in question was not racially motivated. Our disagreement with *Evans* is not in the result but in the reasoning; *Evans* did not rely on the Supreme Court's pattern or practice cases but instead upon the school's history of *de jure* segregation. To the same effect as *Evans* is *Hardy v. Porter*, 613 F.2d at 114 (finding of pattern or practice of discrimination).

promoting of blacks." Of those witnesses who testified, however, none produced the evidence foreseen in the pretrial order. John Hunt testified that he had been the principal of Townsend High prior to the 1966 desegregation. Following desegregation, he became assistant principal at Franklin County High. He testified that while he was the assistant principal at Franklin County High the position of principal became vacant and he was not hired. He also testified, however, that he did not apply for the principalship and was not at all interested in it. Similarly, Ophelia Miller testified that she had been a teacher and principal of an all black school prior to desegregation. When the all black school was closed due to desegregation, she was discharged but recalled within two weeks. In addition, following desegregation she was only a teacher and not a principal. Although a vacancy for a principal did occur after her demotion pursuant to desegregation, she did not apply for the vacancy "because I really didn't want it." This was the only evidence presented by Lujan of the Board's failure to hire or promote blacks as a class.[18]

▮▮▮▮ In contrast, Fred Langford, who was Superintendent of Franklin County Schools from 1968 to 1976 and at the time of the trial, testified that the Board sought out blacks for teaching positions but the Board received few applications due to the school system's low pay scale. In their first year of actively recruiting blacks, the Board obtained initial agreements from six blacks to come into the system to teach. Four of them changed their minds after finding jobs that paid more money. Two of the blacks did stay in the system for three or four years until moving away due to marriages. Langford testified that for the current school year the Board had obtained three applications from blacks and two of the applicants were hired. The third applicant lacked proper certification for the openings that the Board had. During this same year the Board hired only six teachers. Thus, for the current school year (at the time of the trial) one third of the Board's new teachers were black. Langford also testified to several specific instances in which the Board had only one opening and a black was selected for that position over white applicants. Finally, Langford testified that although the Board continues to have a scarcity of black applicants, it has pending applications from over 300 white individuals.

Obviously, this evidence is far from sufficient to establish a pattern or practice of discriminatory hiring by the Board. Insofar as disparate impact might be relevant, Lujan has not identified any facially neutral practice which excludes a disproportionate number of blacks from being hired or promoted, and, as the evidence related above reveals, there was in fact no disparate impact upon blacks in the hiring or promotional practices of the Board.[19] Fi-

---

**18.** Lujan also relies on a prior employment discrimination case against the Board, *Hill v. Franklin County Board of Education*, 390 F.2d 583 (6th Cir.1968). In that case, we found that one black teacher had been discriminatorily discharged following desegregation. Her damages were limited, however, because she was offered another job within ten days of her discharge. Needless to say, the discriminatory discharge of one teacher for ten days does little to advance a claim that the Board engaged in a pattern or practice of discrimination over ten years later. Lujan also relies on the Board's failure to accord him his *Singleton* rights. As we concluded above, however, Lujan had no *Singleton* rights.

**19.** The district court found that the defendants used subjective criteria in selecting the new head football coach. Although the use of sub-jective criteria may be analyzed as a facially neutral employment practice under the disparate impact model of *Griggs, see Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 93 n. 10 (6th Cir.1982), Lujan has failed to show that the subjective criteria, in fact, caused any disparate impact—that is, the numerical disparity is still lacking.

Lujan also complains that the use of subjective criteria violated the mandates of *Singleton* and *Rolfe.* Those cases require, however, only that objective criteria be used to determine which teachers to demote or discharge. *See Singleton,* 419 F.2d at 1218 ("the staff member to be *dismissed or demoted* must be selected on the basis of objective and reasonable non-discriminatory standards"); *Rolfe,* 391 F.2d at 80 ("teachers *displaced* ... must be judged for continued employment by definite objective standards").

nally, the history of *de jure* segregation in Franklin County does not suffice as direct evidence of a *current* facially discriminatory policy.[20] *Cf. supra* note 16. Accordingly, we conclude that Lujan has failed to present circumstances which warrant shifting the burden of persuasion to the defendants. The district court therefore properly allocated the burden of proof.

## V.

Lujan's final argument is that the defendants failed to articulate a legally sufficient nondiscriminatory reason for their selection of Roberts. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court held that after the plaintiff establishes a prima facie case the defendant must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. In *Burdine*, the Court held that to meet this burden of production, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *See* 450 U.S. at 255, 101 S.Ct. at 1094. Lujan points to certain testimony by defendant Hannah to the effect that Lujan was not hired because of his age and argues that a Title VII defendant may not justify a hiring decision attacked as being racially discriminatory by asserting that the true motivation was another form of prohibited discrimination. We reject Lujan's claim for two reasons.

■ First, contrary to Lujan's suggestion, the defendants in this case did not fail to articulate *any* legitimate, nondiscrimina-

tory reason for the hiring decision, but instead articulated several nonracial justifications, *one* of which is, arguably, legally insufficient. The bulk of the testimony concerning the defendants' selection of Roberts focused on his excellent coaching record and the enthusiasm he had displayed while coaching at other schools. The testimony about Lujan's age as a factor in the hiring decision was, in contrast, rather fleeting. Thus, the defendants did articulate a legitimate, non-discriminatory reason. We are simply not confronted with the case Lujan envisions: a defendant attempting to overcome a plaintiff's prima facie case of racial discrimination only with testimony that it was practicing age discrimination instead.

■ Second, nothing in the record before us indicates that Lujan objected to Hannah's testimony or otherwise presented this argument to the district court. To the extent that the defendants could not legally justify their selection of Roberts over Lujan by reference to the ages of the applicants, Lujan should have either objected to the testimony in question as irrelevant because probative only of a legally insufficient excuse or acquiesced in the admission of the testimony and later argued to the district court the point he seeks to present here.[21] Since we do not consider arguments not raised below, Lujan is barred from presenting this claim here. *See Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 120, 78 L.Ed.2d 119 (1983); *Bannert v. American Can Co.*, 525 F.2d 104, 111 (6th

Neither case requires the use of objective criteria in making a *promotion* decision. Finally, we note that although subjective criteria "provide a ready mechanism for discrimination" and are to be "carefully scrutinized," their use is "not *per se* violative of Title VII." *See Rowe*, 690 F.2d at 93.

**20.** Although several all-white schools remain in Franklin County, the only evidence in the record indicates that these schools exist in isolated rural areas where no blacks live. Thus, the existence of these schools does not establish that the Board has a facially discriminatory policy as to student assignments, much less as

to teaching or coaching positions. *See Dayton Board of Education v. Brinkman*, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1979) (intentional faculty segregation does not, standing alone, establish a prima facie case of intentional segregative student assignments).

**21.** We do not decide whether an objection is necessary to preserve such an argument, only that an objection would be sufficient to do so and that the issue is not properly preserved if there is neither an objection to the evidence nor a presentation of the argument to the district court in another form.

Cir.1975), *cert. denied*, 426 U.S. 942, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).[22]

## VI.

For the reasons stated above, the judgment of the district court is AFFIRMED. The parties shall bear their own costs on appeal.

22.  Lujan does not argue on appeal that he is excused by the plain error doctrine. *See gener-ally* Fed.R.Evid. 103(d).